STATE OF OHIO, et al., Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,
Respondents.

Nos. 86–1096, 86–1116, 86–1117, 86–1119, 86–
1120 to 86–1123, 90–1276, 90–1277, 90–
1280, 90–1285, 90–1286, 90–1288, 90–1289,
90–1293 to 90–1295, 90–1297, 90–1439, 90–
1444, 90–1449, 90–1451 and 90–1453.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 3, 1993.

Decided July 20, 1993.

Donald A. Brown, Victoria L. Peters, and Alan C. Williams argued the cause, for petitioners Com. of PA, Dept. of Environmental Resources, California, Colorado, Com. of KY, New Jersey, New Mexico Environment Dept., New York, and Ohio, and intervenor State of Minn. With them on the briefs were Beverly M. Conerton, Roderick E. Walson, Theodora Berger, Brian Hembacher, Charlotte Robinson, Mary Ann R. Baker, Gordon J. Johnson, Jack Van Kley, and Ellen B. Leidner. James D. Ellman, Bryon A. Thompson, Paul H. Schneider, Jacqueline H. Berardini, Charlotte Robinson, Mary C. Jacobson, and R. Brian McLaughlin also entered appearances for petitioners.

Lewis C. Green argued the cause, for petitioner Missouri Coalition for the Environment.

Edmund B. Frost, David F. Zoll, Michael W. Steinberg, and Arline M. Sheehan entered appearances, for petitioner Chemical Mfrs. Assn.

Randy M. Mott entered an appearance, for petitioners CPC Intern., and ASARCO, Inc.

Mark G. Weisshaar, David O. Ledbetter, Edward H. Commer, and Toni K. Allen entered appearances, for petitioner Edison Elec. Institute.

George C. Freeman, Jr., Alfred R. Light, and James Kimble entered appearances, for petitioner American Ins. Ass'n.

Timothy A. Vandervere, Jr. and John C. Martin entered appearances, for petitioner United Technologies Corp.

Samuel I. Gutter and Peggy L. O'Brien entered appearances, for petitioner General Elec. Co.

Mark G. Weisshaar and Jeffrey N. Martin entered appearances, for petitioners American Tel. & Tel. Co., and Bridgestone/Firestone Inc.

Scott A. Schachter and Alice L. Mattice, Attorneys, Dept. of Justice, and Lawrence E. Starfield, Counsel, E.P.A., argued the cause, for respondents. With them on the briefs was Roger Clegg, Acting Asst. Atty. Gen. Carl Strauss, Roger J. Marzulla, Edward J. Shawaker, Elizabeth Ann Peterson, Richard B. Stewart, Marilyn P. Jacobsen, Raymond Ludwiszewski, and Earl Salo also entered appearances, for respondents.

Michael W. Steinberg, Hunter L. Prillaman, David F. Zoll, Dell E. Perelman, G. William Frick, Ellen Siegler, Paul E. Shorb, III, and Barton C. Green were on the brief, for intervenors Chemical Mfrs. Ass'n, American Petroleum Institute, and American Iron & Steel Institute.

Cynthia L. Amara was on the brief, for amicus curiae of the Commonwealths of Massachusetts and Virginia, and the states of Alaska, Arizona, Florida, Maine, Maryland, Michigan, Montana, New Hampshire, Rhode Island, South Carolina, and Washington.

Victoria L. Peters entered an appearance, for intervenor State of Colo.

Paul E. Shorb, III and Barton C. Green entered appearances, for intervenor American Iron & Steel Institute.

Mark G. Weisshaar and David O. Ledbetter entered appearances, for intervenor Edison Elec. Institute.

Michael W. Steinberg, Arline M. Sheehan, and David F. Zoll entered appearances, for intervenor Chemical Mfrs. Ass'n.

Susan M. Schmedes and Ellen Siegler entered appearances, for intervenor American Petroleum Institute.

Alan C. Williams entered an appearance, for intervenor State of Minn.

Gordon J. Johnson entered an appearance, for intervenor State of N.Y.

Before MIKVA, Chief Judge, EDWARDS and RANDOLPH, Circuit Judges.

Opinion PER CURIAM.

Concurring opinion filed by Circuit Judge RANDOLPH.

PER CURIAM:

These consolidated petitions present a multifarious challenge to Environmental Protection Agency ("EPA") regulations promulgated under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613. The regulations under review are portions of the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, commonly known as the "NCP."

### Glossary of Acronyms

**ARAR** Applicable or Relevant and Appropriate Requirements

**CERCLA** Comprehensive Environmental Response, Compensation, and Liability Act of 1980

**EPA** Environmental Protection Agency

**FS** Feasibility Study

**J.D.A.** Joint Deferred Appendix

**MCL** Maximum Contaminant Level

**MCLG** Maximum Contaminant Level Goal

**MOCO** Missouri Coalition for the Environment

**NCP** National Contingency Plan

**NIH** National Institutes of Health

**OMB** Office of Management and Budget

**O & M** Operations and Maintenance

**PRP** Potentially Responsible Party

**RI** Remedial Investigation

**ROD** Record of Decision

**SARA** Superfund Amendments and Reauthorization Act of 1986

**SDWA** Safe Drinking Water Act

**SMOA** Superfund Memorandum of Agreement

## I

Before Congress created the Environmental Protection Agency ("EPA" or "the Agency"), and long before Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675, there was a National Contingency Plan ("NCP"). In 1968, a group of federal agencies developed the first NCP, which was a multi-agency strategy for dealing with environmental disasters. *See* Freedman, *Proposed Amendments to the National Contingency Plan: Explanation and Analysis,* 19 Envtl.L.Rep. 10,103, 10,105–06 (1989). In 1970, Congress incorporated the NCP into the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1376, and pursuant to its directive, the President issued the first published NCP. Water and Environmental Quality Improvement Act of 1970, Pub.L. No. 91–224, 84 Stat. 91, § 102 (1970); 35 Fed.Reg. 8508 (1970). The NCP, which acquired its current name—the National Oil and Hazardous Substances Pollution Contingency Plan, 36 Fed.Reg. 16,215 (1971)—in 1971, was revised a number of times throughout the 1970s. *See* 37 Fed. Reg. 2808 (1972); 38 Fed.Reg. 21,888 (1973); 45 Fed.Reg. 17,832 (1980). By 1980, a comprehensive NCP was in place, although it applied only to discharges into waters regulated by the Clean Water Act. *Id.* "It did not apply to releases to groundwater or soil, and it did not provide authority or funding for long-term federal response to chronic hazards." Freedman, *supra,* 19 Envtl. L.Rep. at 10107.

CERCLA came next. Enacted in 1980, CERCLA provided "for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive waste disposal sites." Pub.L. No. 96–510, 94 Stat. 2767, 2767. We have summarized its general scheme in previous decisions. *See, e.g., Ohio v. United States Dep't of Interior,* 880 F.2d 432, 438–40 (D.C.Cir.), *reh'g denied,* 897 F.2d 1151 (1989) (*en banc* ); *Ohio v. EPA,* 838 F.2d 1325, 1327–29 (D.C.Cir.1988).

Of particular importance to this case is the prominent role of the NCP under CERCLA. Section 104(a)(1) of CERCLA authorizes the President "to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time . . . , or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment." 42 U.S.C. § 9604(a)(1). The NCP thus "provide[s] the organizational structure and procedures" for responding to hazardous waste threats. 40 C.F.R. § 300.1. It is the means by which EPA implements CERCLA.

When Congress enacted CERCLA in 1980, it directed the President to revise and republish the NCP in light of the new law. 42 U.S.C. § 9605(a). Pursuant to section 115 of CERCLA, the President assigned EPA the responsibility of amending the NCP. *See* 42 U.S.C. § 9615; Exec. Order No. 12,316, 46 Fed.Reg. 42,237 (1981); Exec. Order No. 12,-580, 52 Fed.Reg. 2923 (1987). In 1982, EPA issued a new version of the NCP. 47 Fed. Reg. 31,180 (1982). EPA revised the NCP again in 1985. 50 Fed.Reg. 47,912 (1985). When Congress passed the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613, which significantly revised the statute, Congress directed the President to revise the NCP again to reflect the changes in CERCLA. 42 U.S.C. § 9605(b). EPA issued these revisions to the NCP in 1990. 55 Fed.Reg. 8666 (1990).

Petitioners, whom we shall call "the States," include both states and private parties [1] contending that EPA's changes to the

---

1. This case consolidates a number of petitions for review challenging the NCP. The petitioners before us are: State of Ohio; State of Colorado; Chemical Manufacturers Association; State of New York; Commonwealth of Pennsylvania, Department of Environmental Resources; New

NCP in 1985 and 1990 are inconsistent with the requirements of CERCLA. The petitions for review challenge two general categories of NCP provisions. One category involves claims that the NCP unlawfully diminishes the level of environmental protectiveness in the remedy selection process and cleanup provisions of CERCLA. (These claims are resolved in Parts II, III, and IV of the opinion.) The second category involves claims that the NCP improperly limits the States' participation in the cleanup process while increasing their financial burden. (These claims are resolved in Part V of the opinion.) The specific provisions of CERCLA and the NCP at issue in this case will be discussed in the portion of the opinion analyzing petitioners' claims regarding those provisions.

## II

The States first challenge several elements of the NCP definition of legally "applicable" or "relevant and appropriate" environmental standards, known as "ARARs." CERCLA does not define ARARs, but the statute does require that remedial actions at Superfund sites result in a level of cleanup or standard of control that at least meets the legally applicable or otherwise relevant and appropriate federal (or stricter state) requirements. 42 U.S.C. § 9621(d)(2)(A). The NCP defines "applicable requirements" as follows:

> *Applicable requirements* means those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site. Only those state standards that are

identified by a state in a timely manner and that are more stringent than federal requirements may be applicable.

40 C.F.R. § 300.5. "Relevant and appropriate requirements" are those substantive requirements that, while not "applicable," nonetheless "address problems or situations sufficiently similar to those encountered at the CERCLA site that their use is well suited to the particular site." *Id.*

### A. Does the NCP definition of ARARs as "substantive" requirements violate CERCLA?

■ The States claim that the NCP definition of ARARs is contrary to CERCLA because it excludes "procedural" requirements, such as recordkeeping and reporting to the government, by inserting the word "substantive" into the definition. The States argue that limiting ARARs to substantive requirements is contrary to the plain language of CERCLA because the statute itself does not distinguish between substantive and procedural requirements. They also contend that the definition is inconsistent with congressional intent because the SARA legislative history gives no indication that Congress intended for ARARs to be limited to substantive requirements. The States argue in the alternative that EPA's distinction between substantive and procedural requirements is irrational.

The States are correct that CERCLA does not explicitly draw a line between substantive and procedural requirements, but neither does the statutory language clearly forbid the NCP distinction. In fact, as the following discussion indicates, an application of traditional tools of statutory construction, *see NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 123, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987); *Natu-*

Mexico Environment Department; Commonwealth of Kentucky; State of California; State of New Jersey; Missouri Coalition for the Environment; General Electric Company; American Telephone & Telegraph Company; Bridgestone/Firestone, Inc.; LaSalle Steel Co.; Bull NH Information Systems Inc.; McDonnell Douglas Corp.; Seagate Technology Inc.

The following parties intervened: American Iron & Steel Institute; American Petroleum Institute; Edison Electric Institute; State of Minnesota; Texas Instruments, Inc.; Borg-Warner Co.; Mobil Oil Corp.; Gencorp. Inc.; and Oklahoma Publishing Co.

The following states appeared as *amici curiae* in support of petitioners: Alaska, Arizona, Florida, Maine, Maryland, Massachusetts, Michigan, Montana, New Hampshire, Rhode Island, South Carolina, Texas, Virginia, and Washington.

ral Resources Defense Council v. Reilly, 983 F.2d 259, 266 (D.C.Cir.1993), strongly suggests that CERCLA is concerned only with substantive environmental requirements. In any case, the NCP limitation of ARARs to substantive standards certainly represents a reasonable and permissible construction of the statute. See Chevron v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We do not dwell in our analysis on the question of which of Chevron's two prongs best resolves this issue.

In limiting ARARs to procedural requirements, EPA reasonably interprets CERCLA's reference to "a level or standard of control" to be directed at those environmental laws governing "how clean is clean"—that is, the level or degree of cleanup required to remedy various types of toxic contamination. The CERCLA section at issue, section 121(d), is titled "Degree of cleanup," and it talks of standards that apply "to any hazardous substance, pollutant or contaminant," 42 U.S.C. § 9621(d)(2)(A), not of standards that apply more generally to a site or a party executing a cleanup. Moreover, the only specific requirements explicitly set out in the statute are substantive standards such as Maximum Contaminant Levels established in the Safe Drinking Water Act and Federal Water Quality Criteria established in the Clean Water Act. Finally, contrary to the States' claim, the SARA Conference Report explicitly states that "[n]ew section 121(d) establishes the substantive standards that remedial actions ... must meet." H.R.Conf. Rep. No. 962, 99th Cong., 1st Sess. (1985), U.S. Code Cong. & Admin. News 1986, pp. 2835, 3339.

The States are surely correct that the procedural requirements of various environmental statutes are intended to ensure that the substantive contaminant levels are met. However, this does not compel EPA to impose these requirements under CERCLA. The language and structure of section 121(d) strongly support, if not compel, the EPA interpretation. The NCP represents at the very least a permissible construction of CERCLA within the dictates of Chevron.

B. *Does the NCP improperly restrict the meaning of state ARARs to standards that are generally applicable and legally enforceable?*

■ The States also claim that the NCP construction of the statutory term "promulgated" is inconsistent with CERCLA. As noted supra p. 1526, CERCLA requires that Superfund remedial actions result in a level of cleanup that at least meets federal, or stricter state, ARARs. 42 U.S.C. § 9621(d)(2)(A). The statute contains an additional requirement with regard to state standards: they must be "promulgated ... under a State environmental or facility siting law" in order to be considered as possible ARARs. 42 U.S.C. § 9621(d)(2)(A)(ii). CERCLA does not define "promulgated," but the NCP interprets the term to mean "standards [that] are of general applicability and are legally enforceable." 40 C.F.R. § 300.400(g)(4).

■ None of the States' arguments establishes that EPA's definition is an impermissible construction of this admittedly undefined term. Under Chevron, EPA need not establish that the statute compels its regulation. Where congressional intent on the precise question at issue is unclear, it is enough that the Agency's construction is reasonable. Chevron v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). EPA's definition of "promulgated" clearly meets this standard.

The States claim that the ordinary meaning of the term "promulgated" precludes the NCP's narrow definition. However, the dictionary definitions that the States cite—which include notions such as "official announcement" and "to make ... obligatory"—are perfectly consistent with the NCP requirements of general applicability and legal enforceability. Neither the absence of clear legislative history, nor the fact that the word sometimes has a broader meaning, demonstrates that the NCP definition is impermissible.

The States also argue that another CERCLA provision, allowing the President to waive ARARs that "the State has not consistently applied," 42 U.S.C. § 9621(d)(4)(E), indicates

that EPA carries the burden of proving inconsistent application by the State if it decides to waive an ARAR. The NCP definition of "promulgated," the States argue, shifts the burden to the States to prove the general applicability of a state standard before it will be adopted as an ARAR. This argument is unavailing because the NCP definition and the cited CERCLA provision are perfectly consistent. Under the NCP definition, a standard must be generally applicable on its face, and if so, the standard is a potential ARAR. However, if such generally applicable standard is not applied consistently, then the standard may be waived under section 9621(d)(4)(E).

The States' remaining arguments on this point merely suggest alternative reasonable interpretations of the statute. The States suggest different language that Congress might have used to indicate clearly its authorization of EPA's approach. However, just as the statute does not compel EPA's interpretation, neither does the absence of clear language render the Agency's approach impermissible. Furthermore, the inclusion in CERCLA of the terms "standards," "criteria," and "limitations" in addition to "requirements" does not, as the States suggest, necessarily indicate a broader class of state rules than those generally applicable and legally enforceable. Finally, the States' attack on EPA's allegedly inconsistent uses of the term must be rejected. EPA's definition of "promulgate" is limited to the specific context of state requirements, and the Agency is defining an ambiguous term inserted in the statute by Congress. *See* 40 C.F.R. § 300.-400(g)(4). EPA is not acting inconsistently by using the term differently from its use in other contexts.

C. *Does the NCP improperly restrict the meaning of federal ARARs to those "promulgated" under federal environmental laws?*

■ The States also object to the NCP definition of ARARs insofar as it is limited to requirements *"promulgated* under *federal"* environmental laws. 40 C.F.R. § 300.5 (emphasis added). The States argue that in setting out possible ARARs, CERCLA includes the word "promulgated" in reference to state standards, but not federal standards. *Compare* 42 U.S.C. § 9621(d)(2)(A)(i) ("any standard ... under any Federal environmental law") and 42 U.S.C. § 9621(d)(2)(A)(ii) ("any *promulgated* standard ... under a State environmental or facility siting law") (emphasis added). Thus, argue the States, the NCP is contrary to CERCLA insofar as it requires that federal standards must be promulgated to be considered as possible ARARs.

We do not reach the merits of this argument because the States waived the claim by failing to raise it during rulemaking proceedings before the Agency. *Linemaster Switch Corp. v. EPA,* 938 F.2d 1299, 1308 (D.C.Cir. 1991); *Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 680 (D.C.Cir. 1983). The States argue that the court should exercise its discretion to consider this issue despite the States' failure to raise it below because the policies behind the waiver rule would not be frustrated if the court were to address the merits in this case. We disagree.

The States point to some of the purposes of the waiver doctrine—to allow an administrative agency to make a factual record and exercise its discretion or apply its expertise, *see McKart v. United States,* 395 U.S. 185, 193–94, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969)—and argue that these concerns are not implicated here because the States raise a purely legal challenge to the NCP. However, with the possible exception of developing a factual record, these concerns *are* relevant to an agency's legal interpretation of a statute which it is implementing. The notion of deference to agency interpretations of law embodied in *Chevron* is founded on just such concerns. *See Chevron,* 467 U.S. at 843–45, 104 S.Ct. at 2782–83.

Furthermore, the waiver doctrine is also concerned with notions of agency autonomy and judicial efficiency. The doctrine promotes agency autonomy by according the agency an opportunity to discover and correct its own errors before judicial review occurs. Judicial efficiency is served because issues that are raised before the agency might be resolved without the need for judi-

cial intervention. *McKart*, 395 U.S. at 195, 89 S.Ct. at 1663. The efficiency concern is especially germane to this challenge to the NCP, involving an extremely complex rulemaking in which a multitude of issues might be raised for the first time before this court in the absence of the waiver doctrine.

The States also point out that this court has "excused the exhaustion requirements for a particular issue when the agency has in fact considered the issue," *Natural Resources Defense Council v. EPA*, 824 F.2d 1146, 1151 (D.C.Cir.1987), but they offer no evidence that EPA actually considered an objection to the limitation of ARARs to "promulgated" federal standards. Neither the States nor any other party raised an objection to the use of the word "promulgated" with respect to federal environmental standards, and EPA therefore had no opportunity to consider the issue.

Finally, the States argue that this issue presents a matter of great public importance worthy of allowing an exception to the waiver doctrine. *See Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 156 (D.C.Cir.1985). In *Foundation*, this court decided the level of environmental review required of the National Institutes of Health ("NIH") before it approved the first deliberate release of genetically engineered, recombinant-DNA-containing organisms into the open environment. Although the plaintiffs had failed to raise their objections to the release during the period of NIH review, the court nonetheless upheld the district court's decision to address the claims because of the grave public importance of insuring appropriate environmental review "of a new technology with unknown environmental consequences." *Id.*

Of course, the public health that CERCLA and the NCP are aimed at protecting is also an extremely important concern. But the choice between two alternative readings of the CERCLA provision at issue here is not so critical to the overall scheme. The States present no convincing argument that limiting ARARs to *promulgated* federal standards will compromise CERCLA's health protection goals or is otherwise of such gravity as to warrant departure from settled waiver principles.

### D. Does the NCP improperly fail to apply zero-level Maximum Contaminant Level Goals ("MCLGs") as ARARs?

■ The States challenge EPA's decision that Maximum Contaminant Level Goals ("MCLGs) established under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f to 300j–26, do not have to be attained for contaminants whose MCLG has been set at a level of zero. 40 C.F.R. § 300.430(e)(2)(i)(C). The States contend that EPA lacks authority to depart from a statutory requirement to achieve MCLGs, and in the alternative, that even if EPA possesses this authority, it has failed to provide a reasoned basis for its departure.

The SDWA is specifically referenced in section 121(d)(2)(A) of CERCLA as one of the federal laws containing ARARs for Superfund cleanups. 42 U.S.C. § 9621(d)(2)(A). The SDWA identifies two standards for exposure to contaminants. The first, Maximum Contaminant Level Goals ("MCLGs"), are generally unenforceable goals that reflect the level for a given contaminant at which "no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." 42 U.S.C. § 300g–1(b)(4). Many MCLGs for carcinogens are set at zero. 55 Fed.Reg. 8750 (1990). The second type of standards, Maximum Contaminant Levels ("MCLs")—the actual maximum permissible concentration levels under the SDWA—must be set as close as "feasible" to their corresponding MCLGs, taking into account available technology and cost. 42 U.S.C. § 300g–1(b)(4)–(5).

While MCLGs are unenforceable under the SDWA, section 121 of CERCLA converts them into enforceable goals, providing:

> Such remedial action shall require a level or standard of control which at least attains Maximum Contaminant Level Goals established under the Safe Drinking Water Act ... where such goals or criteria are relevant and appropriate under the circumstances of the release or threatened release.

42 U.S.C. § 9621(d)(2)(A). Consistent with this requirement, the NCP generally requires the attainment of MCLGs. 40 C.F.R. § 300.430(e)(2)(i)(B). When the MCLG for a contaminant has been set at a level of zero, however, the NCP requires only that the MCL be attained. In essence, EPA has made a categorical determination that MCLGs set at a level of zero are never "relevant and appropriate under the circumstances" of a release.

This determination was based on EPA's conclusion "that it is impossible to detect whether 'true' zero has actually been attained." 55 Fed.Reg. 8752 (1990). During rulemaking to promulgate MCLGs under the SDWA, EPA "emphasized that ... zero is not a measurable level in scientific terms." 50 Fed.Reg. 46,884, 46,896 (1985). "Due to limitations in analytical techniques, it will always be impossible to say with certainty that the substance is not present. In theory, RMCLs [Recommended Maximum Contaminant Levels] at zero will always be unachievable (or at least not demonstrable)." 49 Fed. Reg. 24,330, 24,347 (1984).

The States contend that EPA's decision concerning zero-level MCLGs is inconsistent with CERCLA's mandate that all remedial actions attain MCLGs. This argument ignores the full language of the section, which imposes the requirement "where such goals ... are relevant and appropriate under the circumstances of the release or threatened release." 42 U.S.C. § 9621(d)(2)(A). This language leaves EPA with discretion to determine when MCLGs are relevant and appropriate. The States contend, though, that such discretion cannot be exercised in a categorical manner, but instead must be based on a case-specific determination at individual sites. Hence, there is no reason for EPA to make an individualized determination of what they have concluded can never be relevant and appropriate.

The States also contend that even if EPA has discretion to conclude that zero-level MCLGs are never relevant and appropriate, it has not justified the decision to do so in this case. But EPA articulated a number of justifications, see 55 Fed.Reg. 8750–52 (1990), and we find its reliance on the fact that true

zero levels can never be detected to provide adequate support for the Agency's decision. As we understand EPA's scientific analysis, one can never prove a true zero level. If the measuring device indicates zero, this shows only that the device is not sufficiently sensitive to detect the presence of any contaminants. It does not show the total absence of the contaminants. In other words, if one asserts that zero contaminants are present, this can be *falsified* by showing the presence of some detectable level, but it can never be shown to be *true*. EPA chose to set MCLGs for carcinogens at zero under the SDWA because they "are goals which may or may not be practically achievable and the practicality of these goals should be factored into the MCLs," not the MCLGs. 50 Fed.Reg. 46,896 (1985). In contrast, EPA concluded that "ARARs must be measurable and attainable since their purpose is to set a standard that an actual remedy will attain." 55 Fed.Reg. 8752 (1990).

The States do not contest EPA's scientific conclusion that zero-level MCLGs are not achievable. Instead, they argue that EPA could select a method of measurement approximating zero by setting "a goal of achieving the analytical detection limits for specific carcinogens." Final Amended Joint Brief of Petitioning States at 68. That EPA could do this, however, does not mean it is required to do so. Section 121 requires the selection of MCLs where MCLGs are unattainable. That is what the NCP does. That conclusion is reasonable given EPA's discretion to determine when ARARs are relevant and appropriate.

### III

The next set of challenges by the States addresses a variety of issues concerning remedy selection: the role of cost-benefit analysis in remedy selection; the requirement that selected remedies are permanent to the maximum extent practicable; the use of a cancer risk range in remedy selection; and the requirement of five-year review of certain remedial actions.

**A.** *Does the NCP establish an improper cost-benefit analysis in the remedy selection process?*

■ Section 121 of CERCLA, added by SARA, requires the selection of remedial actions "at a minimum which assures protection of human health and the environment." 42 U.S.C. § 9621(d)(1). Although a different provision of section 121 requires the selection of remedial actions that are also cost-effective, 42 U.S.C. § 9621(b)(1), the States interpret section 121(d)(1) to prohibit EPA from considering the cost of a remedial action when it determines the level of protectiveness to be achieved by that remedial action. EPA is in full agreement with the States' interpretation of § 121(d)(1). *See* 55 Fed. Reg. 8726 (1990). The States contend, however, that two provisions in the NCP implicitly authorize the use of cost-benefit analysis, thereby permitting cost to be considered in determining the level of protectiveness to be achieved by a remedial action. In making this argument, the States distort the language of the NCP, which is carefully structured so "that protection of human health and the environment will not be compromised by other selection factors, such as cost." *Id.*

The States first point to a provision in the NCP authorizing EPA to balance nine different criteria, including both protection of human health and cost, in selecting a remedy. 40 C.F.R. § 300.430(f)(1)(i)(A). But while the NCP identifies nine criteria to be used in selecting a remedy, all of the criteria are not given equal weight. Instead, they are divided into three classifications: threshold criteria, primary balancing criteria, and modifying criteria. Under this structure, "[o]verall protection of human health and the environment and compliance with ARARs (unless a specific ARAR is waived) are threshold requirements that each alternative must meet in order to be eligible for selection." 40 C.F.R. § 300.430(f)(1)(i)(A). EPA explained in the preamble to the NCP that remedial alternatives "must be demonstrated to be protective ... in order to be eligible for consideration

in the balancing process by which the remedy is selected." 55 Fed.Reg. 8726 (1990). The identification of threshold criteria therefore undermines the States' claim that by listing nine criteria, the NCP permits the level of protectiveness to be affected by cost.

The States also point us to the NCP's definition of "cost-effectiveness," which states that "[a] remedy shall be cost-effective if its costs are proportional to its overall effectiveness." 40 C.F.R. § 300.430(f)(1)(ii)(D). The States contend that this language actually authorizes the use of cost benefit analysis. In making this argument, though, the States ignore the first sentence of the same section of the NCP that they are challenging. It states: "Each remedial action shall be cost-effective, provided that it first satisfies the threshold criteria set forth in § 300.-430(f)(1)(ii)(A) and (B)." *Id; see also* 55 Fed.Reg. 8727 (1990). Thus, consistent with the creation of threshold criteria, the NCP explicitly prohibits consideration of costs in the manner complained of by the States.[2]

**B.** *Does the NCP improperly fail to require the selection of permanent remedies to the maximum extent practicable?*

■ The States next argue that the NCP is inconsistent with section 121(b)(1)'s requirement that the President select remedial actions "that utilize[ ] permanent solutions ... to the maximum extent practicable." 42 U.S.C. § 9621(b)(1). The NCP classifies permanence as one of the five primary balancing criteria, along with reduction of toxicity, mobility, or volume; short-term effectiveness; implementability; and cost. 40 C.F.R. § 300.430(f)(1)(i)(B). The States reason that because the selection of permanent remedies "is one of the overarching statutory principles of remedy selection under CERCLA," Final Amended Joint Brief of Petitioning States at 27, the other balancing criteria, particularly cost, should play no role in EPA's determination whether a permanent remedy is to be selected. In essence, the States would like permanence to be treated

---

**2.** The intervenors argue in support of EPA that cost must be considered in determining the level of protection to be achieved. EPA, however,

rejected their argument, *see* 55 Fed.Reg. 8726 (1990), and the industry intervenors did not seek review of that decision.

as an additional threshold criterion that must be evaluated independently of cost.

The flaw in the States' argument is in the premise that permanence is an overarching statutory principle. This premise is not supported by the statutory language. Section 121(b)(1), which the States rely upon, requires the President to "select a remedial action that is protective of human health and the environment, that is cost effective, and that utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable." 42 U.S.C. § 9621(b)(1). The statutory language places as much emphasis on the selection of cost-effective remedies as it does on the selection of permanent remedies. Although the NCP elevates protection of human health and the environment to a threshold criterion, a different provision in section 121 provides the basis for that treatment. 42 U.S.C. § 9621(d)(1); see supra p. 1531. But there is nothing in section 121 to suggest that selecting permanent remedies is more important than selecting cost-effective remedies.

The States offer two responses. The first is a decision defining "practicable" as " 'possible to practice or perform' or 'capable of being put into practice, done, or accomplished.' " Ashton v. Pierce, 541 F.Supp. 635, 641 (D.D.C.1982) (quoting Webster's Third New International Dictionary (1963)), aff'd, 716 F.2d 56 (D.C.Cir.1983); cf. American Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 508–09, 101 S.Ct. 2478, 2490–91, 69 L.Ed.2d 185 (1981). The Ashton court had before it a statute requiring a single goal to be achieved to the extent practicable. A 1973 amendment to the Lead–Based Paint Poisoning Prevention Act required the Secretary of Housing and Urban Development to "establish procedures to eliminate as far as practicable the hazards of lead paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary." 42 U.S.C. § 4822. The regulations at issue in Ashton authorized the use of cost-benefit analysis in determining the appropri-

ate remedy and the court found no basis for this approach in the statute. In contrast, section 121(b)(1) of CERCLA mandates the achievement of multiple goals. If EPA were to require the selection of permanent remedies whenever possible, it would be ignoring the statutory mandate to select cost-effective remedies.

The States' second response relies on comments made from the floor of Congress. We have frequently cautioned against placing much weight on such statements. See, e.g., Colorado v. United States Dep't of Interior, 880 F.2d 481, 490 (D.C.Cir.1989); International Bhd. of Elec. Workers, Local Union No. 474 v. NLRB, 814 F.2d 697, 717 (D.C.Cir.1987); Northern Colorado Water Conservancy Dist. v. Federal Energy Regulatory Commission, 730 F.2d 1509, 1519 (D.C.Cir.1984). That caution is certainly warranted here. For every set of comments supporting the States' position, there is another set of comments supporting the opposite position. See, e.g., 132 Cong.Rec. 29,-719–20 (1986) (statement of Rep. Lent); id. at 29,743 (statement of Rep. Eckart, Chairman of Conference Committee).

The States argue in the alternative that even if permanence is not treated as a threshold criterion, the NCP should at least place special emphasis on the selection of permanent remedies. But the NCP does exactly that. It requires that "[t]he balancing [of alternative remedies] shall emphasize long-term effectiveness and reduction of toxicity, mobility, or volume through treatment." 40 C.F.R. § 300.430(f)(1)(i)(E). In the preamble, EPA explained that "[t]hese two criteria are given primary consideration in the rule and preamble when analyzing the relative merits of the alternatives. These criteria will be the most important, decisive factors in remedy selection when the alternatives perform similarly with respect to the other balancing criteria." 55 Fed.Reg. 8725 (1990). Given the statutory requirement to achieve a number of competing goals, EPA's decision concerning how much emphasis to place on the selection of permanent remedies is a reasonable one.

C. *Does the NCP cancer risk range improperly fail to protect human health and the environment without regard to cost?*

The States next challenge EPA's use of a cancer risk range between $10^{-6}$ and $10^{-4}$ in the NCP, arguing that an exposure level greater than $10^{-6}$ is never appropriate. A $10^{-4}$ risk subjects the surrounding population to an increased lifetime cancer risk of 1 in 10,000. A $10^{-6}$ risk subjects the surrounding population to an increased lifetime cancer risk of 1 in 1,000,000. When EPA develops objectives for a remedial action at a site, it selects a remediation goal that "establish[es] acceptable exposure levels that are protective of human health." 40 C.F.R. § 300.430(e)(2)(i). EPA attempts to use health-based ARARs to set the goal, but if ARARs are nonexistent or unsuitable for use, EPA establishes the goal based on criteria in the NCP. 55 Fed.Reg. 8712 (1990). "For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between $10^{-6}$ and $10^{-4}$ ...." 40 C.F.R. § 300.430(e)(2)(i)(A)(2). The NCP expresses a preference for remedial actions that achieve a level of $10^{-6}$ however, the ultimate decision depends on a balancing of nine criteria, including cost. *Id.;* 55 Fed.Reg. 8718 (1990).

The States contend that by permitting cost to play a role in determining the level of exposure, the cancer risk range fails to meet the requirement in § 9621 that remedial actions be "protective of human health." 42 U.S.C. § 9621(b)(1); *see also* 42 U.S.C. § 9621(d)(1). The States' argument necessarily depends, though, on the notion that an exposure level greater than $10^{-6}$ is not protective of human health. CERCLA requires the selection of remedial actions "that are protective of human health," not as protective as conceivably possible. A "risk range of $10^{-4}$ to $10^{-6}$ represents EPA's opinion on what are generally acceptable levels." 55 Fed.Reg. 8716 (1990). Although cost cannot be used to justify the selection of a remedy that is not protective of human health and the environment, it can be considered in se-

lecting from options that are adequately protective.

The States also argue that the actual risk range selected is not adequately protective. EPA concluded, though, that all levels of exposure within the risk range are protective of human health. *Id.* EPA has used $10^{-4}$ as an upper bound for establishing risk levels in the past, *see* 53 Fed.Reg. 51,394, 51,426 (1988), and "[m]any ARARs, which Congress specifically intended be used as cleanup standards at Superfund sites, are set at risk levels less stringent than $10^{-6}$," 55 Fed.Reg. 8717 (1990). The States offer no evidence challenging EPA's position that $10^{-4}$ represents a safe level of exposure, and in any event, we give EPA's findings on this point significant deference. *See New York v. EPA,* 852 F.2d 574, 580 (D.C.Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989).

The States also argue that EPA failed to justify the use of a range, instead of a single point. But EPA explained its decision to use a range. While "[t]he use of $10^{-6}$ expresses EPA's preference for remedial actions that result in risks at the more protective end of the risk range," 55 Fed.Reg. 8718 (1990), the Agency is also required to consider other factors in selecting an appropriate remedy. "Factors related to exposure, uncertainty and technical limitations may justify modifications of initial cleanup levels that are based on the $10^{-6}$ risk level." *Id.* A flexible approach to developing remedial goals is justified by the multiple statutory mandates of CERCLA, so long as EPA meets the statutory requirement of protectiveness.

The States' final argument is that we should not defer to EPA's judgment because of OMB's role in developing the NCP. Executive Order No. 12,580 provides that "[a]ll revisions to the NCP, whether in proposed or final form, shall be subject to review and approval by the Director of the Office of Management and Budget." 52 Fed.Reg. 2923, 2924 (1987). CERCLA, though, grants the President authority to revise the NCP, and OMB is part of the Executive Office. 42 U.S.C. §§ 9605, 9615. Perhaps for this reason, "[t]he States are not challenging the authority of OMB to review the NCP." Fi-

nal Amended Joint Brief of Petitioning States at 38. Instead, the States question whether deference is appropriate. The preamble reveals that EPA considered a number of comments from OMB, as well as from other interested parties, such as the States. EPA then settled on a final rule, and it alone claimed responsibility for the contents of the NCP. 55 Fed.Reg. 8813 (1990). Our review is based on EPA's justification for changes in the NCP, and its response to comments from a number of parties. We are not reviewing, or deferring to, any justification offered by OMB.

D. *Has EPA improperly interpreted the CERCLA requirement of five-year review of certain remedial actions?*

■ The States next challenge EPA's interpretation of the CERCLA requirement of five-year review of certain remedial actions. This claim must also be rejected. CERCLA provides for a five-year review of Superfund sites as follows:

> If the President selects a remedial action that results in any hazardous substances ... remaining at the site, the President shall review such remedial action no less often than each 5 years after the initiation of such remedial action to assure that human health and the environment are being protected by the remedial action being implemented. In addition, if upon such review ... action is appropriate at such site ... the President shall take or require such action.

42 U.S.C. § 9621(c). EPA, exercising power delegated from the President, is also required to supply Congress with a list of sites subject to review, the results of reviews, and any actions taken in light of the reviews. *Id.*

EPA interprets this provision to require review only when remedial action "results in hazardous substances ... remaining at the site above levels that allow for unlimited use and unrestricted exposure." 40 C.F.R. § 300.430(f)(4)(ii). A site is not designated for review when the initial remedial action renders the site safe, under the standards prevailing at the time of the determination, for all purposes and for an unlimited period

of exposure through drinking water, air, or any other "exposure pathway."

The States attack this standard on two grounds. First, the States argue that EPA's approach violates clear statutory language requiring a review when "any hazardous substances" remain at the site. 42 U.S.C. § 9621(c). The Agency responds that the regulation merely imposes a *de minimis* gloss on the CERCLA requirement in order to avoid an absurd result. EPA maintains that under the approach that the States suggest, the Agency would be required to conduct a review of every site, every five years, in perpetuity, because it is virtually impossible to prove that not a single molecule of hazardous material remains at a site. *See supra* p. 1530.

The States do not dispute that their suggested approach would require review at all sites every five years and impose a mammoth monitoring burden on EPA. Rather, the States argue that a *de minimis* exception is impermissible in this case under *Public Citizen v. Young*, 831 F.2d 1108 (D.C.Cir.1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988). In *Public Citizen*, this court refused to allow a *de minimis* exception to the "Delaney Clause" in the Pure Food and Drug Act, which provided that a color additive will be deemed unsafe if appropriate tests reveal that it "induce[s] cancer in man or animal." *Public Citizen*, 831 F.2d at 1112. The States seize in particular on the *Public Citizen* court's admonition that the *de minimis* doctrine cannot "thwart a statutory command; it must be interpreted with a view to 'implementing the legislative design.'" *Id.* at 1113 (quoting *Alabama Power Co. v. Costle*, 636 F.2d 323, 360–61 (D.C.Cir.1979)).

The "legislative design" is not being flouted by EPA's reading of the five-year review provision because the statutory command is not so clear as to rule out EPA's application of a *de minimis* exception. The *Public Citizen* court relied heavily on the "almost inescapable" terms of the Delaney Clause and the substantial legislative history supporting an absolutist application of the language. *See Public Citizen*, 831 F.2d at 1112–17. The terms at issue here are not so rigid: the phrase "any hazardous substances" could

easily mean "*even one* hazardous substance" as opposed to "any *amount* of any hazardous substance." In addition, the legislative history provides no convincing support for the States' position. The States point to the comment of a single Senator to bolster their position:

> The periodic review provision is intended to assure that Superfund cleanups keep pace with developing technologies and that remedial actions are upgraded to take advantage of such developing technologies. The ultimate goal of the Superfund program must be to implement permanent solutions at all national priorities list sites. One way to accomplish this goal is to require periodic review and to assure that sites are not removed from the ambit of the program until such solutions have been implemented.

132 Cong.Rec. 28,426 (1986) (statement of Sen. Mitchell). EPA's interpretation is completely consistent with Senator Mitchell's comments, which do not in any way suggest that a permanent solution has not been implemented within the meaning of the statute once a site is rendered safe for all purposes and for an unlimited period of exposure. Thus, EPA's implementation of five-year review represents a permissible construction of the statute.

Even assuming *arguendo* that the States' reading of the statute were indeed the "literal" one, a *de minimis* exception might nonetheless be appropriate. The *Public Citizen* court noted that the literal meaning of a statute need not be followed where the precise terms lead to absurd or futile results, or where failure to allow a *de minimis* exception is contrary to the primary legislative goal. The States' version of the statute would require that *every* CERCLA site be subject to five-year review because, as discussed *supra* p. 1530, EPA cannot detect whether "true" zero has been attained with respect to a particular hazardous substance. Section 9621(c) certainly does not appear to have been drafted to require perpetual five-year review at every Superfund site. EPA's interpretation, which requires review only where a hazardous substance is present in an amount appreciable enough to present some

possibility of harm, squares with the health-protective purpose of the statute. To go beyond that is to adjudge Congress incompetent to fashion a rational legislative design.

The States also argue that under EPA's approach, any five-year reviews that are conducted—at those sites where the initial cleanup action does not allow unlimited use and unrestricted exposure—will be rendered meaningless because EPA has stated that "the five-year review is not intended as an opportunity to consider an alternative to a protective remedy that was initially selected." 55 Fed.Reg. 8730–31 (1990). The States argue that because all remedies must be "protective" as of implementation, the review will never provide an opportunity for new remedial action. EPA responds convincingly that new action will occur when the review reveals that the remedy is *no longer* protective—for example, where a remedial technology has failed, or where a newly promulgated standard indicates that the old standard is no longer protective. Thus, EPA's construction does not render the five-year review provisions a nullity.

The more substantial argument is that the Agency will not bring new toxicological information or new technologies to bear at those sites that initially fell within the Agency's *de minimis* exception and are therefore not subject to five-year review. The States are correct that five-year review will not occur at sites deemed safe under the standards prevailing at the time of the determination, and that the latest information therefore will not automatically be brought to bear at these sites through the five-year review mechanism. However, this fact does not demonstrate that the Agency's regulation is an impermissible interpretation of the statute. As long as the *de minimis* exception is permissible under the statute, as we hold that it is, the fact that new technologies and information will not be applied through the five-year review mechanism does not render EPA's construction of the statute impermissible.

We also hasten to note that a location initially deemed safe for all purposes and for an unlimited period of exposure would never

be listed as a Superfund site in the first instance. Moreover, to say that new information will not be applied to a site via the five-year review mechanism is not to say that the new information will not be applied *at all.* If a site deemed safe for any use and any amount of exposure is later understood to be unsafe under new standards developed in light of new toxicological information, the site could again be eligible for Superfund treatment. Although five-year review of such sites might lead to greater protection of public health (at greater cost), we cannot say that omitting these sites from five-year review is an impermissible construction of the statute.

## IV

The States make three additional challenges to the NCP remedy selection and cleanup provisions, none of which are ripe for judicial review. The ripeness doctrine requires us to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Both prongs of this test dictate delaying review of the States' remaining claims.

The claims are unfit for resolution because "judicial appraisal ... is likely to stand on a much surer footing in the context of a specific application of th[ese] regulation[s] than could be the case in the framework of the generalized challenge made here." *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). "Where we believed the agency's practical application of a statement would be important, we have found the issue not ripe." *Public Citizen v. Nuclear Regulatory Commission,* 940 F.2d 679, 683 (D.C.Cir.1991). As to the second prong of the ripeness analysis, the States will not be prejudiced or suffer any other significant hardship by our decision to defer resolution of these issues until they are raised in the context of a site-specific challenge. *See* 42 U.S.C. §§ 9604(c)(3), 9621(f)(2), 9622(d), 9659, 9613(h)(4). We discuss each of the claims in turn.

### A. *Does NCP remedy selection guidance concerning the use of engineering and institutional controls violate CERCLA's remedy selection requirements?*

The States first argue that one of EPA's "program expectations" violates CERCLA by authorizing the use of institutional controls (such as fences and deed restrictions) as a sole remedy at Superfund sites. The NCP provision regarding selection of an appropriate remedy provides in part as follows:

> (iii) *Expectations.* EPA generally shall consider the following expectations in developing appropriate remedial alternatives:
>
> . . . .
>
> (D) EPA expects to use institutional controls such as water use and deed restrictions to supplement engineering controls as appropriate for short- and long-term management to prevent or limit exposure to hazardous substances, pollutants, or contaminants.... The use of institutional controls shall not substitute for active response measures (e.g., treatment and/or containment of source material, restoration of ground waters to their beneficial uses) as the sole remedy unless such active measures are determined not to be practicable, based on the balancing of trade-offs among alternatives that is conducted during the selection of remedy.

40 C.F.R. § 300.430(a)(1)(iii).

The States interpret this language to authorize EPA to choose, based on cost considerations, institutional controls as the sole remedy for cleaning up hazardous waste sites. As a result, they believe that this provision may allow EPA to use cost considerations to select a cleanup remedy that may not comply with the minimum human health and environmental protectiveness requirements of CERCLA, *see* 42 U.S.C. § 9621(b)(1), (d)(1), and to select a remedy in which there is no treatment or removal of contaminants.

However, EPA explained in the Federal Register that the program expectations are not intended to displace the use of the nine

criteria identified in 40 C.F.R. § 300.-430(e)(9)(iii):

> EPA has placed the expectations in the rule to inform the public of the types of remedies that EPA has achieved, and anticipates achieving, for certain types of sites. These expectations are not, however, binding requirements. Rather, the expectations are intended to share collected experience to guide those developing cleanup options.... *However, the fact that a proposed remedy may be consistent with the expectations does not constitute sufficient grounds for the selection of that remedial alternative. All remedy selection decisions must be based on an analysis using the nine criteria.*

55 Fed.Reg. 8702 (1990) (emphasis added); *see also* 40 C.F.R. § 300.430(f)(1)(i)(A) ("Overall protection of human health and the environment and compliance with ARARs ... are threshold requirements that each alternative must meet in order to be eligible for selection.") Thus, any remedy relying on institutional controls must meet the threshold requirement of protectiveness.

As the foregoing discussion amply demonstrates, this issue is unfit for judicial decision at this time because the States' argument is premised on a hypothetical application of a nonbinding statement in the NCP. The States acknowledge that institutional controls can be utilized as a sole remedy where other remedies are not practicable, and they must concede that EPA might never implement institutional controls as a sole remedy in a manner that the States (or another party with standing) find objectionable. Furthermore, any appeal that is brought would necessarily have to be decided on the basis of the precise circumstances of the cleanup at issue and the alternative remedies available and practicable in that context. Thus, the issue is better resolved in the context of a specific application of the nonbinding statement.

B. *Do the NCP provisions concerning ground water restoration strategies and approaches improperly exempt certain contaminated groundwater resources?*

The States next argue that the NCP provisions for dealing with contaminated ground water are inconsistent with the CERCLA mandate for protection of human health and the environment and for compliance with ARARs. *See* 42 U.S.C. § 9621(b)(1), (d)(1), (d)(2)(A). In the preamble to 40 C.F.R. § 300.430, EPA sets out the following program expectations:

> EPA expects to return usable ground waters to their beneficial uses wherever practicable, within a timeframe that is reasonable given the particular circumstances of the site. When restoration of ground water to beneficial uses is not practicable, EPA expects to prevent further migration of the plume, prevent exposure to the contaminated ground water, and evaluate further risk reduction.

55 Fed.Reg. 8846 (1990). The NCP also provides that the documentation of a remedy selection must "[i]ndicate, as appropriate, the remediation goals ... that the remedy is expected to achieve. Performance shall be measured at appropriate locations in the ground water, surface water, soils, air, and other affected environmental media." 40 C.F.R. § 300.430(f)(5)(iii)(A).

The States challenge the NCP approach to ground water contamination on four grounds. First, the States assert that EPA's expectation of selecting "a timeframe that is reasonable given the particular circumstances of the site," 55 Fed.Reg. 8846, permits significant delay in implementing remedies and thereby permits EPA to avoid making improvements in the environment and the level of protectiveness. The States claim that the NCP should require rapid implementation of remedies whenever possible. EPA points in response to language describing its general ground water policy and explaining that the Agency's

> preference is for rapid restoration, when practicable, of Class I ground waters and contaminated ground waters that are currently, or likely in the near-term to be, the source of a drinking water supply. The most appropriate timeframe must, however, be determined through an analysis of alternatives....

> More rapid restoration of ground water is favored in situations where a future

demand for drinking water from ground water is likely and other potential sources are not sufficient. Rapid restoration may also be appropriate where the institutional controls to prevent the utilization of contaminated ground water for drinking water purposes are not clearly effective or reliable.

55 Fed.Reg. 8732 (1990). Thus, in a situation where health could be jeopardized, EPA intends to rapidly restore the water; in other situations, the timeframe may be longer.

Second, the States argue that the NCP improperly permits a remedy to incorporate a point of compliance that is an unlimited distance away from the source of ground water contamination. The States point to the following language in the preamble to 40 C.F.R. § 300.430(f)(5)(iii)(A):

> EPA believes that remediation levels should generally be attained throughout the contaminated plume, or at and beyond the edge of the waste management area, when the waste is left in place. However, EPA acknowledges that an alternative point of compliance may also be protective of public health and the environment under site-specific circumstances.

55 Fed.Reg. 8753. The States emphasize the flexible nature of the preamble language. EPA notes in reply that the preamble expresses a clear preference for remediation throughout the plume and states that alternatives must in any case be protective of public health and the environment.

Third, the States argue that the EPA ground water policy permits EPA to ignore compliance with ARARs. The States assert that EPA achieves this result with respect to Class I and II ground water by establishing an exclusive federal ARAR. The States point to the following statement of EPA's general ground water policy:

> For Class I and II ground waters, preliminary remediation goals are generally set at maximum containment levels, and non-zero MCLGs where relevant and appropriate, promulgated under the Safe Drinking Water Act or more stringent state standards....

55 Fed.Reg. 8732. EPA responds that the NCP clearly requires compliance with all ARARs as a threshold requirement, and that the general statement on ground water policy does not affect the NCP requirement.

As for Class III ground water, the States argue that EPA has determined improperly that Safe Drinking Water Act ("SDWA") standards are not ARARs. The States note the following language:

> For Class III ground water (i.e., ground water that is unsuitable for human consumption—due to high salinity or widespread contamination that is not related to a specific contamination source—and that does not have the potential to affect drinkable or environmentally significant ground water), drinking water standards are not ARAR and will not be used to determine preliminary remediation goals.

55 Fed.Reg. 8732. EPA responds that standards from other statutes such as the SDWA only apply where "legally applicable." 42 U.S.C. § 9621(d)(2)(A). Thus, EPA argues, it has properly concluded that where the ground water does not come within the scope of the SDWA, the Agency is not obligated to apply those standards. EPA acknowledges that it must apply the standards in any case if it determines that they are otherwise "relevant and appropriate under the circumstances" of the specific site in question. Id. The NCP sets out the procedure for making the "relevant and appropriate" determination. See 40 C.F.R. § 300.400(g)(2).

Fourth, and finally, the States assert that a variety of additional preamble statements, regarding general ground water policy and specific NCP regulations, permit remedies that are inconsistent with the CERCLA mandate for remedies that protect human health and the environment and are permanent to the maximum extent practicable. See 42 U.S.C. § 9621(b)(1), (d)(1). EPA again responds that the nine criteria set out in 40 C.F.R. § 300.430(e)(9)(iii)—the first of which is protection of human health and the environment, see id. § 300.430(e)(9)(iii)(A), and the third of which is permanence, see id. § 300.430(e)(9)(iii)(C)—must always be used in selecting a remedy. EPA points out that the nine criteria will be balanced on a site-specific basis, but that overall protection of

the environment is a threshold requirement that each alternative must meet in order to be considered. 40 C.F.R. § 300.-430(f)(1)(i)(A).

The States must make site-specific challenges to press each of its four ground water contamination claims—that the NCP permits remedy implementation timeframes that are unreasonably long, that the NCP permits remedies to incorporate unreasonably remote points of compliance, that the NCP permits EPA to ignore compliance with ARARs, and that the NCP permits remedies that are inconsistent with the CERCLA mandates of protection of human health and the environment and permanence. EPA argues with regard to each claim that the States have simply misapprehended the import of the various statements that form the basis of their arguments. Because the claims are premised on hypothetical applications of non-binding statements in the NCP, we conclude that they should be addressed in site-specific challenges in which the reviewing court can consider "the agency's practical application" of its statements. *See Public Citizen,* 940 F.2d at 683.

C. *Does the NCP improperly fail to apply Federal Water Quality Criteria ("FWQC") as ARARs?*

■ The States' final set of unripe claims involves EPA's decision to use MCLs and non-zero MCLGs in place of the federal water quality criteria established under the Clean Water Act ("CWA"). CERCLA requires that remedial actions attain these federal water quality criteria ("FWQC") wherever "relevant and appropriate under the circumstances of the release or threatened release." 42 U.S.C. § 9621(d)(2)(A). Like MCLGs, FWQC do not have any independent regulatory impact. *See supra* pp. 1529–30. Rather, they present scientific data and guidance on the effects of pollutants from which state and federal authorities may derive actual requirements.

CERCLA provides the following guidance in deciding when an FWQC is relevant and appropriate:

In determining whether or not any [FWQC] ... is relevant and appropriate

under the circumstances of the release or threatened release, the President shall consider the designated or potential use of the surface or groundwater, the environmental media affected, the purposes for which such criteria were developed, and the latest information available.

42 U.S.C. § 9621(d)(2)(B)(i). The preamble to 40 C.F.R. § 300.430(e)(2) states as follows with regard to the choice between MCLGs and MCLs on the one hand, and FWQC on the other, as ARARs:

EPA believes that an MCL or non-zero MCLG is generally the [ARAR] for *ground water that is a current or potential source of drinking water* ... even if an FWQC for human health is also available....

. . . .

EPA believes that MCLs or non-zero MCLGs generally will be the [ARAR] for *surface water designated as a drinking water supply,* unless the state has promulgated water quality standards (WQS) for the water body that reflect the specific conditions of the water body.

55 Fed.Reg. 8755 (1990) (emphasis added). In addition, the NCP provides that MCLs and non-zero MCLGs "shall be attained by remedial actions for ground or surface waters that are current or potential sources of drinking water" where relevant and appropriate under the circumstances of the release. 40 C.F.R. § 300.430(e)(2)(i)(B).

The States argue that the NCP preamble and regulations embody an unreasonable decision to use MCLs and non-zero MCLGs in place of FWQC. EPA responds that the issue is not ripe for review because the preamble merely sets out a general view that may or may not be followed in particular cases. We agree. Although EPA sets out a detailed rationale for its tentative conclusion, the preamble guidance is nonetheless non-binding. Thus, this claim should also be disposed of in a site-specific challenge in which the reviewing court can consider a specific application of the challenged language. *Public Citizen,* 940 F.2d at 683.

## V

The States' final group of claims focus on the proper role of individual states in CERCLA cleanups and the allocation of costs between the federal and state governments.

A. *Does the NCP improperly limit the States' ability to take actions authorized by CERCLA?*

The States next challenge the NCP's provisions regarding the delegation of CERCLA authority. Specifically, the States argue that Subpart F of the NCP impermissibly precludes state officials from applying for cleanup and related enforcement authority pursuant to section 104 of CERCLA, and from exercising authority that is properly assignable to them under the statute.

The applicable part of section 104 states:

A State or political subdivision thereof or Indian tribe may apply to the President *to carry out actions authorized in this section.* If the President determines that the State ... has the capability to carry out any or all of such actions in accordance with the criteria and priorities established pursuant to section 9605(a)(8) of this title *and to carry out related enforcement actions,* the President *may* enter into a contract or cooperative agreement with the State ... to carry out such actions. *The President shall make a determination regarding such an application within 90 days* after the President receives the application.

42 U.S.C. § 9604(d)(1)(A) (1988) (emphasis added). Under this provision, states may apply for enforcement authority and the President "shall make a determination" regarding any such application within ninety days. If a state is determined to be capable of carrying out the policies of the statute, section 104 allows the President to delegate all of the responsibilities authorized in section 104 as well as the authority to take "related enforcement actions." Moreover, a delegation under this section authorizes states to carry out these actions on behalf of federal authorities, not merely in conjunction with them. *See id.* §§ 9604(d)(3) (states may act "on behalf of the President"), 9611(f) (President may delegate to states authority

to obligate federal funds and settle claims against Superfund).

The actions authorized under section 104, in addition to the undefined "related enforcement actions," include the right to take removal or remedial action or "any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment." *Id.* § 9604(a)(1). The section also confers the authority to investigate releases of hazardous substances, direct responses and recover the costs thereof, select remedial actions, and obtain information about and entry upon contaminated sites. *Id.* § 9604(b), (c)(4), (e). The fundamental dispute here centers on the scope of EPA's discretion to bar States from even applying for certain enforcement authority under section 104.

The NCP regulations pertaining to state participation in CERCLA response actions are contained in Subpart F, 40 C.F.R. §§ 300.500–.525 (1991). *See* 55 Fed.Reg. 8666, 8775 (1990) (Subpart F "codifies all regulatory requirements or state participation and involvement in CERCLA-authorized response actions"). There are two types of state-led response actions that are implicated by the Subpart F regulations. The first involves a state acting as the lead agency in a *federally financed cleanup* ("state-lead, fund-financed"); in such a situation, the NCP limits state participation to preparing proposed remedial plans and the final record of decision ("ROD") setting forth the selected remedy. Specifically, states must first enter into a cooperative agreement with EPA in order to receive Superfund financing. 40 C.F.R. § 300.515(a). The state may then perform initial site assessment activities, conduct the remedial investigation ("RI"), do the feasibility study ("FS"), draft and recommend a proposed remedial action plan, and prepare the final ROD. *Id.* However, in state-lead, fund-financed actions, the state may not publish a remedial plan that has not been approved by EPA, or proceed with the response action unless EPA has concurred in, and adopted, the ROD. *Id.* § 300.515(e)(1), (e)(2)(ii). Thus, all final authority is reserved to EPA.

The second type of state-led response action under Subpart F involves a state acting as the lead agency in potentially responsible party ("PRP") or state funded cleanups. In these actions ("state-lead, non-fund-financed"), states need not get EPA concurrence to publish and implement a remedy, but, under the NCP, the states are barred from invoking CERCLA authority. *Id.* § 300.515(e)(2)(ii). In other words, a state may not even apply for such authority pursuant to section 104. Thus, if a state elects to proceed on its own authority, there is a risk that EPA will take later actions or select different remedies under CERCLA that could potentially expose the state or the PRP to additional liabilities. The States contend that, without the ability to invoke CERCLA authority as the lead agency, state officials are severely handicapped in their ability to enforce and settle cleanup obligations.

In the States' view, the Subpart F scheme unlawfully restricts the scope of state participation under CERCLA. The statute provides for the delegation of CERCLA authority to states that apply for, and are found capable of carrying out, section 104 actions. Subpart F, however, establishes a blanket limitation on state participation, barring states from exercising the most important CERCLA authority (remedy selection) in fund-financed cleanups and from using any CERCLA authority in non-fund-financed cleanups, without regard to the capability of any given state.

The first question subsumed by the States' petition on this issue is whether CERCLA requires the grant of authority to a state under section 104 whenever it is sought. The answer to this question is obvious: under the statute, EPA's determination (on behalf of the President) to delegate section 104 responsibilities to state officers is clearly discretionary. The statute directs that states "*may* apply to the President to carry out actions authorized in this section.... [T]he President *may* enter into a contract ... with the State ... to carry out such actions." 42 U.S.C. § 9604(d)(1)(A) (emphasis added). Naturally, terms such as "may" are indicative of discretionary authority. *International Union, UAW v. Dole,* 919 F.2d 753, 756

(D.C.Cir.1990). Furthermore, cooperative contracts are "subject to such terms and conditions as the President may prescribe." 42 U.S.C. § 9604(d)(1)(B). Seeking to counter the clear language of the statute, the States cite several portions of the legislative history as purportedly revealing that the statute's draftsmen intended states to exercise the full range of CERCLA authority. *See, e.g.,* 126 Cong.Rec. 26,761 (1980) (statement of Rep. Florio) (federal Government "required to provide for contracts and grants" to states that have response capability). However, the history cited by the States is composed of isolated references from a long and tangled legislative process. In light of the clear discretionary language used in the enacted version of the statute, we find these statements unpersuasive. Thus, the statute manifestly does not *require* EPA to delegate full CERCLA authority in either state-lead, fund-financed, or state-lead, non-fund-financed responses.

This does not dispose of the issue, however, for the States have raised a second question challenging EPA's determination to preclude all states from even applying for enforcement authority that is otherwise permissible under section 104. As noted above, under section 104, the President must make a determination within ninety days on any application from a state to participate in a CERCLA cleanup through a cooperative agreement. 42 U.S.C. § 9604(d)(1)(A). Thus, under the statute, states have a right to apply for enforcement authority under section 104, and the President is required to respond based on the particular state's capability of performing. Subpart F, though, categorically precludes states from taking CERCLA actions that are not included in the NCP codification of delegable duties, irrespective of the state's capabilities. For instance, Subpart F does not allow delegation of the authority to select the final remedy, despite the fact that such authority is one of those enumerated in CERCLA section 104. Nor is there any mention in Subpart F of enforcement authority that may be delegated to the states. In effect, EPA has determined in a rulemaking that no state may qualify to exercise *all* of the potentially delegable authority of section 104.

To the extent that the NCP merely defines the terms of arrangements governing "cooperative agreements" under 42 U.S.C. § 9604(d)(1)(A) we can see no problem with the regulations. CERCLA expressly provides that such cooperative agreements are to be governed by the terms and conditions of EPA's choosing. *Id.* § 9604(d)(1)(B). Thus, in one sense, the NCP provisions in Subpart F merely provide for a uniform set of conditions to which states entering into cooperative agreements must adhere. Viewed as such, the provisions are a valid exercise of the Agency's rulemaking authority. *See SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) (agencies may choose to implement federal policy on either case-specific basis or in rulemaking); *National Small Shipments Traffic Conference v. Interstate Commerce Commission,* 725 F.2d 1442, 1447 (D.C.Cir.1984) (same).

Moreover, the conditions EPA has placed on state participation under the cooperative agreements are far from arbitrary. Since EPA bears ultimate responsibility under the statute to ensure appropriate remedial responses at release sites, it is not surprising that the Agency also intends to control final remedial selection. *See Ohio v. EPA,* 838 F.2d 1325, 1330–31 (D.C.Cir.1988) ("The most fundamental policy is not that [the states] should be involved in the cleanup but that the cleanup of hazardous waste sites should occur."). Similarly, at least with regard to fund-financed cleanups, EPA must also protect scarce federal resources. *Id.* at 1331. Subpart F of the NCP is one means of accomplishing these two legitimate ends.

The problem with EPA's blanket prohibition in the latest version of the NCP is that it reflects an inexplicable change in policy. Both the 1982 and 1985 NCPs provided that EPA could enter into agreements allowing states to exercise most of the statutory authority available under the statute. *See* 40 C.F.R. § 300.62 (1983); 40 C.F.R. § 300.62 (1986). In neither of the earlier NCPs was an entire category of powers excluded. *See, e.g.,* 47 Fed.Reg. 31,180, 31,186 (1982) (extent of state participation to be a case-specific determination). Thus, the provisions of the current NCP that expressly exclude states from exercising enforcement and remedy selection authority represent a departure from EPA's previous policy of making individualized determinations based on state capability.

Assuming that a regulation of the sort here at issue might be lawful, it could not be promulgated by EPA without some reasoned explanation from the Agency justifying the significant change in policy. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983); *Pittsburgh Press Co. v. NLRB,* 977 F.2d 652, 655 (D.C.Cir.1992). In the present case, EPA offered only the most general and cursory explanation for the new blanket exclusion—the necessity of retaining federal control over remedy selection to ensure consistency. *See* 55 Fed.Reg. 8783 (1990). Yet, the Agency never explained the relationship between remedial consistency and statutory objectives, nor did it substantiate its assumption that state remedy selection would lead to less consistency than the present system in which remedies are selected by diverse EPA field offices. Given that EPA may condition any cooperative agreement as it deems necessary, we see no reason to assume that greater remedial inconsistency would follow from state remedy selection.

The Agency's failure to offer any reasoned explanation is particularly troubling given that several states commented on the blanket exclusion and suggested alternative procedures during the rulemaking proceedings. *See, e.g.,* Comments of Minnesota, *reprinted in* Joint Deferred Appendix ("J.D.A.") at 61–62. Under the circumstances, EPA has no excuse for failing to explain its shift in policy. *See Brookings Mun. Tel. Co. v. FCC,* 822 F.2d 1153, 1169 (D.C.Cir.1987) (agency must consider alternatives suggested in rulemaking and give reasons for rejecting them). Thus, we grant the petition in so far as EPA has not substantiated its new blanket rule against the delegation of certain CERCLA remedial authorities to states, and remand the case to EPA for proceedings consistent with this opinion.

In remanding, we are unwilling to say that every state is entitled to an individualized

determination on every question that might arise as to "capability" under section 104; indeed, we have no doubt that EPA could easily justify certain categorical requirements applicable to all states. Nonetheless, the Agency must make those determinations on the record based on reasoned consideration.

### B. *Does the NCP improperly establish federal/state cost sharing requirements?*

The next two issues raised by the States relate to the allocation of the financial burdens of CERCLA cleanup responses between federal and state authorities.

#### 1. Sharing of Operation and Maintenance Costs

Section 104(c)(3) of CERCLA states that:

(A) the State will assure *all future maintenance of the removal and remedial actions* provided for the expected life of such actions as determined by the President ... (C) the State will pay or assure payment of (i) 10 per centum of the costs of the remedial action, *including all future maintenance,* or (ii) 50 percent (or such greater amount as the President may determine appropriate, taking into account the degree of responsibility of the State or political subdivision for the release) *of any sums expended* in response to a *release* at a facility, that was operated by the State or a political subdivision thereof....

42 U.S.C. § 9604(c)(3) (emphasis added). The States read this provision to impose a 10%/90% (state/federal) allocation for most operations and maintenance costs related to CERCLA cleanup actions. EPA agrees that states are only responsible for 10% of the costs of the *remedial* action, but claims that the NCP properly codifies the Agency's long-standing practice of requiring states to fund 100% of the *maintenance* of a fund-financed remedy. *See* 40 C.F.R. §§ 300.435(f), 300.-510(c). The positions of the parties may be summarized as follows:

*States' Position:*

10%—States' share for "remedial action"

10%—States' share of "all future maintenance"

50%—States' share of sums expended in response to a release at a facility that was operated by the States

*EPA's Position:*

10%—States' share for "remedial action"

100%—States' share of "all future maintenance"

at least 50%—States' share of sums expended in response to a release at a facility that was operated by the States.

The States and EPA reach their respective constructions of the statute via diametrical routes. To begin with, the plain language of the section is open to two plausible interpretations. EPA maintains that the central distinction in the statute is between *maintenance* costs, for which the States are completely responsible under subparagraph (A), and *remedial* actions, for which the States must pay at least ten percent of the costs under subparagraph (C). EPA argues that the inclusion of "all future maintenance" in subparagraph (C) was merely meant to highlight that distinction. In other words, according to EPA, "all future maintenance" cannot modify (or be encompassed within) "remedial action," so the "10 per centum" does not refer to the former.

By contrast, the States understand the phrase "including all future maintenance" in section 104(c)(3)(C)(i) to mean that the states' 10% cost share applies to remedial costs as well as "all future maintenance" costs. Since Congress chose the word "including" rather than "in addition to" or "plus," this is not an unreasonable interpretation. However, it is certainly not compelled.

Hence, to further bolster their case, the States attack EPA's construction as incompatible with the statutory context. As the States point out, the second part of subparagraph (C) (relating to cost sharing for "releases" for which the state was responsible) does not include a reference to "future maintenance costs." Nonetheless, both parties appear to assume that such "releases" include all future maintenance at such sites. Thus, on this assumption, it would seem an especially odd statutory scheme under which

states are responsible for only 50% of costs (presumably part of "any sums expended") at sites that the states themselves operated, but were obligated to pay 100% of maintenance costs at all other sites.

However, EPA's construction does not necessarily lead to the posited quandary. According to EPA, subparagraph (c)(3)(C)(ii) requires states to pay *at least* 50% of all sums expended in response to a release at a state operated facility. Since states are responsible for 100% of maintenance costs under subparagraph (c)(3)(A), the constraints imposed by subparagraph (c)(3)(C)(ii) are inapposite. Therefore, although it imposes an awkward structure upon the statute, the Agency's construction equally accounts for state culpability at release sites.

Just as the parties have antithetical readings of the language of section 104(c), they draw different inferences from the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613 (1986). In that legislation, two additional subparagraphs were added to CERCLA. First, section 104(c)(6) was added, which specifies that, for up to ten years of operation, ground and surface water restoration measures are "remedial action" rather than operations and maintenance. 42 U.S.C. § 9604(c)(6). Second, SARA added section 104(c)(7), which provides that federal funds are to be used for the "[f]ederal share of the payment of the cost of operation or maintenance pursuant to paragraph (3)(C)(i) or paragraph (6)." *Id.* § 9604(c)(7). Since section (c)(6) redesignated maintenance costs for water treatment measures "remedial" for the purposes of section (3)(C)(i), the States contend that Congress must have been referring to the federal share of the cost of other maintenance actions under subparagraph (c)(3). Yet, under EPA's interpretation, this addition would be largely meaningless since maintenance costs in (c)(3) are solely the states' responsibility.

EPA, naturally, has a different understanding of the SARA amendments. Prior to and since SARA, EPA has applied a 10/90 cost sharing ratio to the costs of remedial actions and to the costs of *one year* of maintenance (the "shakedown" period after ROD

objectives are achieved). *See* 50 Fed.Reg. 47,912, 47,924 (1985) (long-term maintenance costs not funded entirely by states since EPA will fund up to one year); 40 C.F.R. § 300.510(c)(2) (EPA may share maintenance costs for up to one year). EPA applied this ratio to all cleanup sites, even those that included water restoration actions, which typically require several years of pumping to achieve final cleanup objectives after the maintenance period has begun. In response to state complaints about this cost sharing arrangement, Congress added section 104(c)(6), essentially redefining maintenance for water treatment actions as "remedial action" for up to ten years. *See* H.R.Rep. No. 253, 99th Cong., 1st Sess., pt. 1 at 70 (1985). However, Congress did not change the cost sharing provisions in section 104(c)(3). Thus, Congress shifted the financial burden of funding maintenance costs for the long-term operation of water restoration systems from the states to EPA. *See id.* at 60; S.Rep. No. 11, 99th Cong., 1st Sess. 21 (1985). Yet, as EPA argues, such a cost shifting would have been unnecessary if the States' interpretation obtained, since EPA would already have been bound to pay for ninety percent of the maintenance costs of *all* types of responses pursuant to section 104(c)(3). Moreover, faced with a clear opportunity to repudiate established EPA policy regarding cost sharing, Congress' decision to merely redefine the maintenance period for water treatment measures represents, if not an implicit adoption of the policy, at least tacit acceptance. *See United States v. Riverside Bayview Homes,* 474 U.S. 121, 137, 106 S.Ct. 455, 464, 88 L.Ed.2d 419 (1985) (refusal of Congress to overrule an agency interpretation is "some evidence of the reasonableness of that construction").

With regard to the States' argument that section 104(c)(7) necessarily implies a federal share of the payment of maintenance costs pursuant to subparagraph (c)(3)(C), the legislative history suggests that the phrase "federal share" in section 104(c)(7) refers only to the maintenance of water treatment operations, restyled as remedial action in section (c)(6), and the costs of maintenance over the one year "shakedown" period for other reme-

dial actions, which EPA has traditionally funded at the 90% level. *See* S.Rep. No. 11 at 21 ("Under current EPA policy, the costs of such operation are provided on a 90 percent Federal share for only one year."); Staff of Joint Comm. on Taxation, 99th Cong., 1st Sess., *Background and Issues Relating to House Bills for Reauthorization and Financing of Superfund 17* (Joint Comm. Print (JCS–13–85) 1985) (states "generally . . . required to pay 10 percent of the capital and first-year operating costs of a remedial action . . . and 100 percent of the operating costs in subsequent years"). Thus, the Agency's construction is not in tension with section 104(c)(7).

In sum, both parties have proposed plausible constructions of this cumbersome statutory section. However, when confronted with language as heavily laden with ambiguity as section 104(c) of CERCLA, we may not second-guess a permissible and reasonable construction posited by the agency charged with implementing the statute. *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Here, EPA's interpretation of section 104(c)(3) is both a permissible, reasonable reading of the statute under the second step of the *Chevron* test, *see* 467 U.S. at 842–44, 104 S.Ct. at 2781–82, and not otherwise arbitrary or capricious under the test of *State Farm*, 463 U.S. at 41–44, 103 S.Ct. at 2865–67.

### 2. Costs Related to Remedial Treatment of Wastewater

■ Section 104(c)(6) of CERCLA provides that states are only responsible for 10% of maintenance costs for a limited type of remedial action (up to ten years of "treatment or other measures . . . necessary to restore ground and surface water quality to a level that assures protection of human health"). 42 U.S.C. § 9604(c)(6). The NCP expressly excludes "source control maintenance measures" and "ground- or surface-water measures initiated for the primary purpose of providing a drinking-water supply" from the activities covered by section 104(c)(6). 40 C.F.R. § 300.435(f)(4). The States consider these exclusions to be arbi-

trary and directly contrary to the statute. Since Congress did not define which measures are "necessary to restore" ground and surface water quality "to a level that assures protection of human health and the environment," EPA may apply its expertise to interpret those phrases, as long as the interpretations are permissible and reasonable. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782.

The States' primary complaint is that "source control measures" may be an integral part of a water restoration measure and, yet, under the NCP, not eligible for 90% federal funding. For instance, landfill covers and leachate collection systems, which are designed to prevent the migration of water into and out of contaminated sites, are among the source control measures that EPA has excluded from categorization under section 104(c)(6). *See* 40 C.F.R. § 300.5. The States contend that section 104(c)(6) requires EPA to operate an *entire* water quality restoration remedy, including elements such as these that may also function as source control measures.

EPA, on the other hand, construed the "necessary to restore" language of the statute as contemplating only those measures that "actively cleanup ground and surface water." 55 Fed.Reg. 8737 (1990). This interpretation is consistent with the legislative history of CERCLA. *See* S.Rep. No. 11 at 21 (exemption applies where "pumping and treating of water or other technology is required"); H.R.Rep. No. 253, Pt. 1 at 70 (section directed at "long-term cleanup remedies, such as pumping and treating of groundwater"). Source control measures do not *treat* any surface or ground water, nor are they "necessary" to "restore" water quality; instead, these activities are required to *maintain* the effectiveness of remedial measures. *See* 55 Fed.Reg. 8738. The States nonetheless insist that these measures are necessary to restore water quality because without them additional releases may result. However, were that the test, virtually all related maintenance activities would qualify as necessary to restore water quality, and hence, as "remedial" under the statute. Such a construction exceeds the apparent reach of the section. The NCP provision excluding

source control measures from the scope of the section 104(c)(6) exemption is far more congruent with the terms of the statute. Thus, we deny the States' petition in so far as it challenges the facial validity of section 300.435(f)(4)(i) of the NCP.

The States also challenge the NCP's exclusion of measures whose primary purpose is to provide drinking water from the scope of section 104(c)(6) of CERCLA. Briefly, the States argue that the exclusion leads to absurd results since a measure used to treat water that will be discharged without beneficial use *would* qualify for 90% federal funding, whereas the same measure used to provide drinking water *would not* qualify.

The States, however, have stretched section 104(c)(6) beyond its intended reach. Section 104(c)(6) is designed to ensure that federal funds are used to pay for the long-term restoration of ground and surface water to *protected levels*. Yet, under the States' approach, federal funds would pay 90% of the costs of treatments designed not to restore water to protective levels, but to provide drinking water, which is not the object of CERCLA responses. Thus, 40 C.F.R. § 300.435(f)(4)(ii), which excludes from section 104(c)(6) treatment measures whose *primary* purpose is to provide drinking water, is entirely consistent with the terms of the statute. This portion of the States' petition is, therefore, denied.

### C. Does the NCP improperly define when a remedy becomes operational and functional?

■ Given that states are responsible for 100% of operations and maintenance ("O & M") costs, the determination of the point at which a response becomes "operational" is an extremely important aspect of the cost sharing issue. Section 300.435(f)(2) of the NCP provides that "[a] remedy becomes 'operational and functional' either one year after construction is complete, *or* when the remedy is determined concurrently by EPA and the state to be functioning properly and is performing as designed, *whichever is earlier*. EPA may grant extensions to the one-year period, as appropriate." 40 C.F.R. § 300.-435(f)(2) (emphasis added); *see also* 40

C.F.R. § 300.510(c)(2) (EPA may share O & M costs for up to one year to ensure remedy is operational and functional). EPA contends that the regulatory presumption that a remedy is operational after one year reflects the practical realities of remedy management. *See* 55 Fed.Reg. 8739 (analogizing to construction grant regulations). The States argue that this aspect of the NCP is arbitrary and capricious because states will be burdened with the costs of responses that are not *actually* operational once a year has passed since the completion of construction.

Here again, though, the States' challenge is premature. By its terms, the NCP merely has articulated a rebuttable presumption that remedies are operational and functional one year after completion. If, in a specific situation, a remedy is not fully functional at the end of a year, EPA has indicated that an extension will be appropriate. 40 C.F.R. § 300.435(f)(2). *See also* 55 Fed.Reg. 8739 (extensions available where remedy not fully operational after a year). If the Agency refuses to grant such an extension, that decision would be subject to challenge. At this point, however, we have no reason to assume that EPA will deny an extension in any situation in which a remedy is not operational after one year. Thus, the challenge to this portion of the NCP is premature.

### D. Does the NCP establish improper provisions on state assurances for institutional controls and site access?

The States next complain that the NCP unlawfully requires assurances relating to institutional controls and site access from states seeking federal funds for response actions.

#### 1. State Assurances of Institutional Controls

Section 300.510(c) of the NCP conditions receipt of fund-financing upon state assurances that institutional controls (e.g., zoning restrictions) implemented as part of a remedial action are "in place, reliable, and will remain in place after the initiation of O & M." 40 C.F.R. § 300.510(c)(1). The States challenge two aspects of this provision. First, the States argue that this section was

promulgated without proper notice and opportunity for comment. Second, the States maintain that the section is arbitrary and capricious because it requires states to act beyond their legal authority on threat of losing federal funding for hazardous waste cleanups.

■ On the first point, the States contend that neither the originally proposed rule, 53 Fed.Reg. 51,394 (1988), nor the interim final rule, 54 Fed.Reg. 4132 (1989), gave notice of the rule finally promulgated in section 300.510(c)(1); the States therefore argue that the rule was adopted in violation of the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706. The test, of course, is whether the final rule that emerged from the administrative process was a "logical outgrowth" of the earlier proposed rules. *Chemical Waste Mgmt. v. EPA,* 976 F.2d 2, 28 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1961, 123 L.Ed.2d 664 (1993).

In this case, EPA's proposed rule required states to provide assurances that they would "assume responsibility for operation and maintenance of implemented remedial actions." 53 Fed.Reg. 51,510. In that same proposed rule, EPA made it clear that it regarded institutional controls as an integral part of many "remedial actions." *See* 53 Fed.Reg. 51,423, 51,427. There was, therefore, reasonable notice that assurances for institutional controls might be required of states where such controls were part of the long-term response to a release. Thus, the final rule was presaged by the proposed rules and a further round of rulemaking is not required.

■ The States also challenge the substance of this requirement as arbitrary and capricious. The States claim that the NCP poses an insuperable barrier to fund-financed remedial action where the state lacks the authority necessary to make the assurances that EPA may require under section 300.-510(c)(1). For instance, *state* officials often are powerless to implement changes in many *local* zoning ordinances. Thus, where a proposed fund-financed remedy requires such changes, the state must either act *ultra vires* or forego federal funding.

Whatever dilemma this framework poses for the states is a product of the statute. Under CERCLA, the states are required to assure *all* future maintenance of the removal and remedial actions, 42 U.S.C. § 9604(c)(3), which may include institutional controls, *see id.* § 9601(24) (listing responses encompassed within the phrase, "remedial actions"). Section 300.510(c)(1) was added to the NCP precisely because EPA lacks the authority to impose many of these controls. 55 Fed.Reg. 8706 (1990). Thus, to the extent that institutional controls are a *necessary* component of a fund-financed remedial action, it is entirely appropriate under section 104(c)(3) for EPA to require assurance of the integrity of these controls prior to spending federal funds on the cleanup. If, for *whatever* reason, the state cannot or will not give the necessary assurances, the statute forbids EPA from proceeding with a fund-financed cleanup. A state wishing to proceed with a fund-financed remedy in such a case may either work with local officials to secure the required assurances (perhaps through a three-party agreement, *see* 40 C.F.R. §§ 300.515(a)(1), 35.6115(a)), or advocate a remedial scheme that does not depend on the problematic institutional controls.

For the foregoing reasons, we deny the petition for review with respect to this portion of the NCP.

## 2. Site Access

■ The States also attack the NCP's site access provisions as arbitrary and capricious. Section 35.6805(p) of the Subpart O regulations provides that, "[t]he State ... is *expected* to use its own authority to secure access to the site and adjacent properties, as well as rights-of-way and easements necessary to complete the response actions." 40 C.F.R. § 35.6805(p) (emphasis added). The States complain that this section constitutes an additional state "assurance," not authorized by CERCLA section 104(c)(3), upon which federal funding is conditioned.

If it were the case that the NCP required states to assure site access, the States would have a colorable claim. By its terms, though, the NCP expressly *does not* condition fund financing on state assurance of site access.

*See* 40 C.F.R. §§ 35.6105(b), 35.6805(i) (list of *required* state assurances does not include site access). Instead, section 35.6805(p) merely articulates EPA's *preference* for state acquisition of site access. EPA has explained that this preference is a matter of expediency and that "EPA will acquire site access only if the state cannot do so." 55 Fed.Reg. 22,994, 23,005 (1990). If at some time in the future EPA attempts to condition federal funding on state assurance of site access, the state involved may bring a site-specific challenge. At this point, any such claim is premature. *See supra* pp. 1536–40.

E. *Does the NCP improperly limit the allowable time for support agency review of technical documents?*

 Section 121(f) of CERCLA requires EPA to promulgate regulations providing for "substantial and meaningful involvement by each State in initiation, development, and selection of remedial actions to be undertaken in that State." 42 U.S.C. § 9621(f)(1). One aspect of this requirement is that states are to be given a "reasonable opportunity" to review and comment upon several documents that are generated in the remedial decision-making process. *Id.* § 9621(f)(1)(E). The NCP implements this statutory requirement through section 300.515(h)(3), which establishes specific default time periods in which a support agency (EPA in state-lead cleanups) must review and comment on lead agency documents. *See* 40 C.F.R. § 300.515(h)(3). Absent a Superfund memorandum of agreement ("SMOA") to the contrary, a support agency has fifteen working days to comment on the RI/FS, ROD, applicable or relevant and appropriate requirements ("ARAR") determination, and ten working days to comment on the proposed remedial plan. *Id.* In addition, the NCP also provides states with numerous opportunities to participate throughout remedy selection and implementation. *See, e.g.,* 40 C.F.R. § 300.515(d) (states involved in RI/FS process), 300.515(e) (states involved in remedy selection). Thus, states may participate in the creation of remedial action documents as well as review the final product of the process.

Nonetheless, the States maintain that section 300.515(h)(3) of the NCP denies them a reasonable opportunity to review and comment on what are often complex and lengthy documents. We are unpersuaded. The participation process described in sections 300.-515(d) and (e) is so extensive that we fail to see how the states will be unfairly burdened by the rules covering review of RI/FSs or proposed remedial plans. The documents subject to review will not be unfamiliar to state officials, so it is not as if the states will be forced to act in the blind in unreasonably short periods of time. For instance, under section 300.515(d), the lead and support agencies are directed to identify potential ARARs and communicate them to each other in a timely fashion. *Id.* § 300.515(d)(1). If EPA intends to waive any state identified ARAR, "or does not agree with the state that a certain state standard is an ARAR, it shall formally notify the state when it submits the RI/FS report for state review." *Id.* § 300.-515(d)(3). Thus, potential conflicts between states and EPA should become apparent during the process and, if not explicitly identified by EPA, be anticipated by the states. Given this structure, an extended review period is unnecessary.

Moreover, the NCP specifically provides for modification of the time periods in section 300.515(h)(3) on a site-specific basis using a SMOA. *Id.* § 505(a)(3); *see also* 55 Fed. Reg. 8781 (1990) (review times in the NCP "can be modified by a SMOA"). Thus, where novel problems are presented, or where the release is of such magnitude that extremely complex remedial measures are anticipated, states may negotiate longer review periods and, again, an EPA refusal to negotiate such an agreement would be open to a site-specific challenge. Absent such circumstances, the review times provided in the NCP allow states a reasonable opportunity to review and comment upon EPA documents. This facet of the States' challenge is, therefore, denied.

F. *Does the NCP improperly define "on-site" for purposes of the exemption from obtaining permits for remedial actions?*

 Section 121(e)(1) of CERCLA provides for a waiver of state and federal per-

mitting requirements for cleanup actions taken "entirely onsite." 42 U.S.C. § 9621(e)(1). The NCP defines "onsite" to mean "the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action." 40 C.F.R. §§ 300.5, 300.400(e)(1). The States challenge this facet of the NCP, arguing that it allows EPA to expand the permit exemption of section 121(e)(1) beyond its intended scope.

Although used in several places, "onsite" is not defined in the statute. Normally, in such a situation, we would presume that Congress intended the disputed term to have its common meaning. *Kosak v. United States*, 465 U.S. 848, 853, 104 S.Ct. 1519, 1523, 79 L.Ed.2d 860 (1984). That presumption does not help us here, though, because "onsite" is a statutory term of art with no "plain" meaning. Faced with this ambiguity, we turn to the definitions offered by the parties. The State petitioners (excluding Ohio, New York, Minnesota, New Jersey and California) define "onsite" formalistically, confining the term to "the continuous contaminated area having the same legal ownership as the actual site of the original disposal." States Brief at 166. For obvious reasons, we cannot hold that Congress meant this and nothing more in its reference to "onsite."

CERCLA provides for an overarching framework within which the federal Government, states, and PRPs can respond to hazardous waste releases. The statutory scheme is meant to transcend artificial geographical and legal distinctions in order to facilitate remedial action. *See, e.g.,* 42 U.S.C. § 9621(e)(1) (no federal, state or local permits required for actions taken under CERCLA), 9621(d)(2) (requirements of other environmental laws become ARARs for actions taken under CERCLA), 9621(d)(4) (EPA may waive substantive requirements of other environmental laws for actions taken under CERCLA). The petitioning States ignore this fundamental statutory premise, and rest their definition of "onsite" on precisely the artificial constraints that the statute meant to reject.

On the other hand, the ability of the statute to accommodate a broader, more func-

tional definition of "onsite" is not limitless. In the definition section of CERCLA, the term "facility" is defined as "any site, or area where a hazardous substance has been deposited . . . or otherwise come to be located." *Id.* § 9601(9)(B); *cf.* 55 Fed.Reg. at 8689 n. 3 ("onsite" broader than "facility"). The statute's implicit definition of "site" in terms of the area of the actual contamination, leads us to conclude that the definition of "onsite" must be anchored to that area as well. How far this anchor will allow EPA to drift, though, is not readily ascertainable using the traditional tools of statutory interpretation.

EPA's definition of "onsite" contained in the NCP is at best ambiguous. The Agency's definition includes "suitable areas in very close proximity to the contamination." 40 C.F.R. § 300.5. Yet, absent a specific application of the NCP, we have no way of knowing what EPA considers a "suitable area," or how far away from the site of contamination EPA would deem "in very close proximity." Thus, we are not presented with a typical *Chevron* second prong case, in which we may determine whether the Agency's interpretation reasonably comports with congressional intent. Here, the meaning of the term "onsite" as it is used both in the statute and the NCP is indeterminate. Thus, no final judgment can be made on the permissibility or reasonableness of EPA's interpretation absent an application of the rule to a specific set of facts. However, forced to construe the NCP definition in a vacuum, we have no trouble in concluding that the regulation on its face is not unlawful.

The NCP definition allows EPA to respond to releases expeditiously and, one would hope, efficaciously. It is a definition that reflects the practical aspects of responding to hazardous waste releases under various conditions. For instance, in many situations, it may be prohibitively burdensome or, in fact, impossible to conduct necessary response measures within a narrowly "contaminated" area. *See* 53 Fed.Reg. 51,406–07 (1988) (flexibility needed to respond to a contaminated plume of ground water extending far beyond the area of contaminated soil); 55 Fed.Reg. 8689–90 (1990) (impossible to locate an incinerator in a contaminated lowland

marsh). Nonetheless, the necessary response measures may so closely relate to the concerned site as to be effectively managed under the aegis of CERCLA.

The same reasoning disposes of the challenge raised to this aspect of the NCP by the Missouri Coalition for the Environment ("MOCO"). MOCO would have "onsite" defined by exactly the same parameters as the area of the contamination, essentially paralleling the CERCLA definition of a "facility." *See* MOCO Brief at 3. Driving this definition is MOCO's concern that allowing CERCLA responses to proceed in areas beyond the extent of the contamination will lead to the subversion of state and local participation in the handling and treatment of hazardous substances in disparate uncontaminated areas. *See* MOCO Brief at 5. If, after experience with the latest NCP, petitioners can show that EPA has abused its flexible definition of "onsite" to deliberately bypass other environmental laws or to implement response activities far afield of contaminated areas, the NCP definition would doubtless be subject to challenge. In the interim, we have no basis to believe that EPA will so abuse the minimal discretion contained in the NCP. Therefore, this portion of the States' petition is denied.

 The States have also challenged one part of the Preamble to the NCP in which EPA proposed to treat non-contiguous, but reasonably related facilities as a single "site." *See* 55 Fed.Reg. 8690–91. It appears, though, that this issue was not properly raised before the Agency, thus foreclosing our review. *See Linemaster Switch Corp. v. EPA,* 938 F.2d 1299, 1308–09 (D.C.Cir.1991). In support of their contention that the issue was raised below, the States have referred us to a public comment challenging EPA's definition of "onsite." *See* States' Reply Brief at 71 n. 36. The comment relied upon offered a proposed definition of "onsite" that limited the term to contiguous areas. *See* Comments of Colorado, *reprinted in* J.D.A. at 128–29. However, this minimal reference to the contiguity issue is so tangential to the principal thrust of the comment that it cannot fairly be said to have been presented to EPA for resolution. Therefore, this portion of the petition for review is dismissed.

CONCLUSION

The petitions for review are granted in part with respect to the issues discussed in Part V.A of this opinion. Although CERCLA does not require EPA to delegate full CERCLA authority in state-lead response actions, the NCP regulations which categorically bar states from exercising enforcement and remedy selection authority represent an inadequately justified departure from the Agency's prior practice. The petition is granted with respect to these regulations, and the matter is remanded to the Agency for further proceedings consistent with this opinion.

The petitions for review are denied with respect to the issues discussed in parts II.A, II.B, II.C, II.D, III.A, III.B, III.C, III.D, V.B.1, V.B.2, V.D.1, and V.E of this opinion. The petitions for review are also denied with respect to the issues discussed in part V.F of this opinion insofar as the petitions present a facial challenge to the regulation in question.

The petitions for review are dismissed as premature with respect to the issues discussed in Parts IV.A, IV.B, IV.C, V.C, and V.D.2 of this opinion. The petitions for review with respect to the issues discussed in Part V.F of this opinion are also dismissed as premature insofar as they attempt to raise a site-specific, as-applied challenge to the regulation in question.

*So ordered.*

RANDOLPH, Circuit Judge, concurring:

With respect to the issue discussed in Part V.A of our *per curiam* opinion, I believe EPA may retain exclusive remedial and enforcement authority without running afoul of CERCLA. I join this portion of today's opinion because the current NCP fails to provide a reasoned explanation for categorically denying states the right to apply to exercise enforcement and remedy selection authority pursuant to § 104(d)(1)(A) of CERCLA. 42 U.S.C. § 9604(d)(1)(A). But I see no problem with EPA imposing such a categorical restriction so long as the Agency provides an adequate justification for doing so. Section 104(d)(1) gives the President unlimited discretion to determine whether a

state is capable of carrying out CERCLA enforcement actions. Under section 104(d)(1)(A), if the President determines that a state has the capability to carry out CERCLA authority, the President "may" enter into a cooperative agreement with the state. Furthermore, such "contract or cooperative agreement ... shall be subject to such terms and conditions as the President may prescribe." 42 U.S.C. § 9604(d)(1)(B). The President can always refuse to grant states enforcement authority after receiving their applications. It follows that EPA can announce beforehand that it will never enter into any agreements depriving EPA of final approval over remedy selection. The regulations already contain numerous conditions on approval of state applications. *See* 40 C.F.R. § 35.600 *et seq.* These conditions do not prevent states from applying to enter into cooperative agreements; they simply inform the states that their applications will not be considered unless those conditions are met. The states, in other words, can apply for anything they want, but EPA may decide that there are some things they just will not get, ever.